| | |
|---|---|
| **UNITED STATES OF AMERICA and** )<br>**PEOPLE OF THE VIRGIN ISLANDS,** )<br> )<br>v. )<br> )<br>**DAMIAN LANG, SR.,** )<br> )<br>**Defendant.** )<br>_____ ) | **Criminal Action No. 2015-0013** |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Pamela L. Colon, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Damian Lang Sr.'s ("Defendant") Motion to Suppress-*Franks* Challenge ("Motion to Suppress") (Dkt. No. 130); the Government's Opposition to Defendant's Motion to Suppress ("Opposition") (Dkt. No. 146); and Defendant's Reply to the Government's Opposition ("Reply") (Dkt. No. 150). Supplemental briefing was submitted by the parties following a substitution in defense counsel. (Dkt. Nos. 214, 222, 225). A hearing on Defendant's Motion to Suppress and his request for a *Franks* hearing was held on February 12, 2019.

Defendant presents three arguments in support of his Motion to Suppress. First, Defendant contends that tangible evidence in the form of ammunition discovered in his residence should be suppressed because the Government's evidence is insufficient to establish Defendant's constructive possession of the ammunition. (Dkt. No. 214 at 1-7). Second, Defendant argues that

the information provided in the affidavit of probable cause used to secure the search warrant for his residence was stale, such that the warrant was not supported by probable cause. *Id.* at 7-9. Third, Defendant claims that the affidavit of probable cause contains false statements and omissions, and that the information remaining in the affidavit once the false statements and omissions are accounted for does not support a finding of probable cause. *Id.* at 11-21. Defendant requests a *Franks* hearing on the veracity of the information contained in the affidavit, and maintains that the evidence discovered during the search of his residence should be suppressed.

For the reasons that follow, the Court will deny Defendant's Motion to Suppress. Specifically, the Court will: (1) deny without prejudice—as premature—the portion of Defendant's Motion to Suppress grounded in the argument that the Government's evidence is insufficient to establish Defendant's constructive possession of the ammunition discovered in his residence; (2) deny the portion of Defendant's Motion to Suppress grounded in the argument that information in the affidavit in support of probable cause was stale; (3) deny the portion of Defendant's Motion to Suppress grounded in the argument that the search warrant for his residence was not supported by probable cause; and (4) deny Defendant's request for a *Franks* hearing.

## I.    BACKGROUND[1]

Defendant is charged in a two-count Indictment filed on April 28, 2015. (Dkt. No. 18).[2] Count 1 charges Defendant as a felon in possession of ammunition in violation of 18 U.S.C.

---

[1] The Court bases the background factual discussion in this section on the record established through the parties' filings and at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[2] Prior to filing the Indictment, the Government commenced this action by filing a Criminal Complaint and an Amended Criminal Complaint on March 20, 2015. (Dkt. Nos. 1, 3).

§922(g)(1). *Id.* at 1. Count 2 charges Defendant with unauthorized possession of ammunition in violation of 14 V.I.C. § 2256(a). *Id.* at 1-2. These charges stem from Defendant's alleged possession of five buckshot shotgun shells on or about October 24, 2014. *Id.*

Two individuals perpetrated an armed robbery of the Bank of St. Croix's Gallows Bay location on September 2, 2014. (Dkt. No. 130-2 at 1). The Bank of St. Croix in Peter's Rest was robbed in a similar manner on October 21, 2014 by two individuals allegedly fitting the same description. *Id.* at 5. According to the affidavit of probable cause in support of the search warrant in this case, on October 22, 2014, Drug Enforcement Administration ("DEA") High Intensity Drug Trafficking Area ("HIDTA") Task Force Supervisor, Lieutenant Sidney Elskoe, provided information to the Virgin Islands Police Department ("VIPD") that Defendant was allegedly involved in the bank robberies. *Id.* The affiant, VIPD Detective Moses President ("Detective President"), further alleged:

P. That a check was made through the Virgin Islands Police Department files which revealed that Mr. Lang has a criminal record which includes armed robbery.

Q. That a check was made with the Probation and Marshall's [*sic*] office of the Superior Court of the Virgin Islands which revealed that Mr. Lang is under house arrest and resides at #125 Concordia Manor Apartment 62 with an electronic monitor and 24 hour house arrest with work release privileges.

R. That a check was made with Marshall [*sic*] Chris Richardson of the Superior Court who is responsible for the monitoring of Mr. Lang. Marshall [*sic*] Richardson assisted us in geographically locating the movements of Mr. Lang on September 2, 2014 from 9:30 a.m. to 12:59 p.m.

S. That the geographic tracking of Mr. Lang revealed that he traveled from the Estate Grove Place area, onto Northside road into the Rattan area in the vicinity of #109 and #110 Estate Rattan (which is the known residence of Mr. Michael Forde). Mr. Lang then travelled to the Gallows Bay area.

T. That according to the geographic mapping of the Superior Court Marshall [*sic*] Service, Mr. Lang was present inside of the Bank of St. Croix located on Anchor Way in the Gallows Bay area at approximately 10:43 a.m. on September 2, 2014.

U. That on October 22, 2014, while reviewing the video footage of both bank robberies along with several members of the Investigation Bureau and the Chief of Police St. Croix District, Chief Parris indicated without hesitation that the individual who is standing at the door during the bank robberies with a handgun is known to him as Mr. Michael Forde, an adult male. Chief Parris indicated that Mr. Forde resides in the Rattan area with his mother.

V. At 10:46 a.m. on September 2, 2014, said geographic mapping showed that Mr. Damian Lang was present in the immediate area where the vehicle (a gray Chevrolet Equinox) identified as the getaway vehicle used after the bank robbery was recovered in the Gallows Bay area.

W. That a firearms check was made through the Virgin Islands Police Department Firearms Bureau with Detective Karen Stout to verify whether Mr. Damian Lang or Mr. Michael Forde possess a license to carry a firearm in the territory of the U.S. Virgin Islands. That it revealed that Mr. Damian Lang and Mr. Michael Forde does [*sic*] not have a license to possess a firearm in the territory of the U.S. Virgin Islands.

(Dkt. No. 130-2 at 6).

The requested warrant was issued by Magistrate Judge Miguel A. Camacho of the Superior Court of the Virgin Islands on October 23, 2014. (Dkt. No. 130-1). The ensuing search of Defendant's residence led to the discovery of five shotgun shells in a kitchen drawer. (Dkt. No. 130 at 5-6). Defendant was charged with the instant offenses as a result of the discovery of this ammunition.

## II.    APPLICABLE LEGAL PRINCIPLES

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend IV. Accordingly, "[t]he threshold requirement for issuance of a warrant is probable cause." *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005). When presented with an application for a search warrant, a magistrate judge is tasked with making a "practical, common-

sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In reviewing a magistrate judge's determination of probable cause, a district court should not "simply rubber stamp a magistrate's conclusions." *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (quotation omitted). Nonetheless, "[t]he decision of the magistrate should be paid great deference." *Id.* (quotation and internal quotation marks omitted). The role of the reviewing court is to "determine whether the magistrate who issued the warrant had a 'substantial basis' for determining that probable cause existed." *Id.* (quotation omitted). A court's "resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

### A.      Stale Information in an Affidavit of Probable Cause

"The '[a]ge of the information supporting a warrant application is a factor in determining probable cause.'" *United States v. Caple*, 403 F. App'x 656, 659 (3d Cir. 2010) (quoting *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993)). Where information supporting the application is "too old, the information is stale, and probable cause may no longer exist." *Id.* (quoting *Harvey*, 2 F.3d at 1322). "Stale information 'may have little value in showing that contraband or evidence is still likely to be found in the place for which the warrant is sought.'" *Id.* (quoting *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997)).

To determine whether the information supporting an application for a search warrant is stale, courts must "look at the facts and circumstances of each case and 'examine the nature of the crime and the type of evidence.'" *Id.* (quoting *Harvey*, 2 F.3d at 1322); *see also Jones*, 994 F.2d at 1056 ("[P]robable cause can be, and often is, inferred by 'considering the type of crime, the

nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property.'") (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985)). The critical consideration is whether, in light of the totality of the circumstances, the interval between the occurrence of the crime and the application for the search warrant was so long as to dispel the likelihood that that evidence sought would still be in the place to be searched. *Jones*, 994 F.2d at 1056 (citing *Jackson*, 756 F.2d at 705).

### B.     *Franks* Challenge

As a general rule, the validity of an affidavit of probable cause supporting a search warrant is presumed. *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). However, in *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court established that "a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause" subsequent to the issuance of the warrant, and "created a mechanism to allow a defendant to overcome the general presumption" of the affidavit's validity. *Yusuf*, 461 F.3d at 383.

To be entitled to a *Franks* hearing, the defendant must first make a "substantial preliminary showing" that the affidavit contains either a false statement or an omission that was "made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *Id.* (citing *Franks*, 438 U.S. at 171; *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).[3] "The preliminary-showing requirement is intended to 'prevent the misuse of a veracity hearing for purposes of discovery or obstruction.'" *United States v. Heilman*, 377 F. App'x 157,

---

[3] A showing of reckless disregard for the truth must involve more than "negligence or innocent mistake[.]" *Wilson v. Russo,* 212 F.3d 781, 787 (3d Cir. 2000) (quoting *United States v. Davis,* 617 F.2d 677, 694 (D.C. Cir. 1979)). Instead, "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know[.]" *Id.* at 783. "[A]ssertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." *Id.*

177 (quoting *Franks,* 438 U.S. at 170-71). A defendant cannot rely on "mere conclusory allegations or a 'mere desire to cross-examine[.]'" *Yusuf*, 561 F.3d at 383 n.10 (quoting *Franks*, 438 U.S. at 171). Instead, a defendant must specifically identify allegedly false statements or omissions in the affidavit and "provide an offer of proof or give a satisfactory explanation for the absence of proof." *Heilman*, 377 F. App'x at 177 (citing *Franks*, 438 U.S. at 171). "Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing." *Id.* (citing *Franks*, 438 U.S. at 171; *Yusuf*, 461 F.3d at 383 n.8).

If the defendant makes the required substantial preliminary showing, he must then prove by a preponderance of the evidence at a *Franks* hearing that (1) "the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) [] such statements or omissions were material, or necessary, to the probable cause determination." *Yusuf*, 461 F.3d at 383 (citing *Sherwood*, 113 F.3d at 399). Where the defendant shows that the affiant knowingly or recklessly omitted information from an affidavit, "the court must remove the 'falsehood created by [the] omission by supplying the omitted information to the original affidavit.'" *Id.* at 384 (quoting *Wilson*, 212 F.3d at 400). A false representation, on the other hand, is corrected by excising the false statement from the affidavit. *Id.* After these revisions are made, "the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit[.]" *Id.* at 383.

## III.    DISCUSSION

### A.    Sufficiency of the Evidence

In his supplemental brief, Defendant argues that the Government should be barred from introducing the ammunition discovered in his apartment at trial because the Government's

evidence is insufficient to establish that Defendant constructively possessed the ammunition. (Dkt. No. 214 at 7). In response, the Government asserts that Defendant's sufficiency of the evidence argument is not a proper basis for a motion to suppress. (Dkt. No. 222 at 1).

The Court is aware of no authority—and Defendant has cited none—which supports the proposition that a challenge to the sufficiency of the Government's evidence against Defendant provides a proper basis for a motion to suppress.[4] In general, challenges to the sufficiency of the prosecution's evidence are properly lodged through a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 after the prosecution has had an opportunity at trial to present its case. *See, e.g., United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir. 2000) ("Unless there is a stipulated record, or unless immunity issues are implicated, a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence . . . Federal Rule of Criminal Procedure 12(b)(2) authorizes dismissal of an indictment if its allegations do not suffice to charge an offense, but such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges.") (citations omitted).

Accordingly, the Court will deny—as premature—the portion of Defendant's Motion to Suppress that is grounded in the argument that the Government's evidence is insufficient to establish Defendant's constructive possession of the ammunition discovered in his residence.

---

[4] Contrary to Defendant's claim, the cases on which he relies do not support the proposition that the Court should analyze the sufficiency of the Government's evidence in ruling on his Motion to Suppress. Instead, each of the cases cited by Defendant addresses the sufficiency of the prosecution's evidence at the post-trial motion for judgment of acquittal stage. *See United States v. Brown*, 3 F.3d 673 (3d Cir. 1993) (reviewing a district court's ruling on a defendant's post-trial motion for judgment of acquittal); *United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996) (same); *United States v. Zeigler*, 994 F.2d 845 (D.C. Cir. 1993) (same); *United States v. Dunlap*, 28 F.3d 823 (8th Cir. 1994) (same).

However, because Defendant requested an opportunity to submit additional briefing on this issue during the February 12, 2019 suppression hearing, the Court will deny the insufficiency of the evidence portion of Defendant's Motion to Suppress without prejudice, and will permit Defendant an opportunity to renew his argument through a motion *in limine* or other appropriate pretrial motion in the event he discovers supporting authority for his proposition.

### B. Staleness of the Information in the Affidavit

Defendant argues that the information in Detective President's affidavit of probable cause relating to Defendant's alleged involvement in the September 2, 2014 Bank of St. Croix robbery was stale because the bank robbery occurred 51 days before the issuance of the warrant, and therefore was insufficient to establish probable cause to believe that evidence of Defendant's alleged participation in the bank robbery would be discovered in his residence at the time the warrant was issued. (Dkt. No. 214 at 9). The Government concedes that 51 days passed between the September 2, 2014 robbery and the issuance of the search warrant on October 23, 2014, but contends that the information in Detective President's affidavit was not stale because possession of a firearm is a "continuing offense." (Dkt. No. 222 at 3-4).[5]

As an initial matter, the Court notes that, although 51 days passed between the September 2, 2014 bank robbery and the issuance of the search warrant, the affidavit of probable cause states that a second bank robbery occurred on October 21, 2014, and alleges that "two adult male

---

[5] The Court notes that the application for a search warrant was not limited to a request to search Defendant's residence for firearms. Instead, the application requested authorization to search for any evidence related to the commission of the bank robberies that occurred on September 2, 2014 and October 21, 2014, including any large amounts of U.S. currency, clothing matching the description of the clothing worn by the bank robbers, documentation for a gray Chevrolet Equinox allegedly involved in the September 2, 2014 robbery, documents pertaining to the Bank of St. Croix, and maps or diagrams of the Bank of St. Croix or the Gallows Bay area. (Dkt. No. 130-2 at 7-8).

individuals that fit the description and demeanor of the two individuals" that perpetrated the September 2, 2014 bank robbery were involved. (Dkt. No. 130-2 at 5). The affidavit also asserts that HIDTA Task Force Supervisor, Lieutenant Sidney Elskoe, provided information that Defendant allegedly was involved in the October 21, 2014 bank robbery. *Id.* In other words, Detective President's affidavit alleges that Defendant participated in two bank robberies, with the most recent robbery occurring just two days before the issuance of the search warrant.

That certain information in an affidavit recounts older events will not necessarily result in a finding of staleness where the affidavit presents evidence of criminal activity of an "ongoing and continuous nature." *See United States v. Marranca*, 98 F. App'x 179, 181 (3d Cir. 2004) (although information in an affidavit "relate[d] the history of a large scale gambling enterprise," the warrant was not based on stale information where the affidavit also "describe[d] the ongoing and continuous nature of the gambling enterprise" and supported "a current belief that [the defendant] participated in illegal gambling activities"); *Caple*, 403 F. App'x at 659 (information in an affidavit reflecting that the defendant "had engaged in drug trafficking activity over a period of months, with the last controlled transaction taking place only weeks before the warrant was issued[,]" was not stale where the affidavit supported a finding that the defendant was "engaged in a continuing criminal enterprise") (citing *United States v. Feliz*, 182 F.3d 82, 87 (1st Cir. 1999)).

In light of the information in the affidavit of probable cause pertaining to Defendant's alleged participation in the October 21, 2014 bank robbery, the Court finds that Defendant's claim that the information contained in the affidavit was stale must fail. The affidavit reflects that Defendant's alleged participation in bank robberies was ongoing and continuous, with the most recent bank robbery occurring only two days before the search warrant was issued. The Court therefore concludes that the information contained in the affidavit of probable cause was not stale

so as to call into question the Magistrate Judge's conclusion that there was a "fair probability" that evidence related to Defendant's alleged participation in the bank robberies would be found in Defendant's residence. *See Gates*, 462 U.S. at 238.

During the suppression hearing, Defendant further argued that the substantive information in the affidavit related to Defendant's alleged participation in the October 21, 2014 bank robbery was insufficient to support a finding of probable cause that Defendant was in fact involved in the second robbery. Even if the October 2014 bank robbery were to be excluded from consideration— as Defendant suggests—the Court does not find the 51-day period between the September 2, 2014 bank robbery and the October 23, 2014 issuance of the warrant to be sufficient under the totality of the circumstances here to support the conclusion that the Magistrate Judge lacked a substantial basis for his finding of probable cause.

The Third Circuit has recognized that cash, clothing, and firearms are all "types of evidence likely to be kept in a [robbery] suspect's residence." *Jones*, 994 F.2d at 1056 (citing *United States v. Hendrix*, 752 F.2d 1226, 1231 (7th Cir. 1985); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988); *United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983)). Overturning the district court's determination that a search warrant was not supported by probable cause, the Third Circuit noted in *Jones* that the passage of two weeks between a robbery and the issuance of a search warrant, "while certainly long enough to enable the defendants to hide the cash, was not so long as to dispel the likelihood that it would still be in their residences." *Id.* (citing *Jackson*, 756 F.2d at 705).

In reaching this conclusion, the Third Circuit cited to the Ninth Circuit's opinion in *United States v. Jackson*, 756 F.2d 703 (9th Cir. 1985). In that case, the Ninth Circuit held that a reasonable inference could be drawn that the defendant "might keep stolen currency in his apartment from a

bank robbery two months earlier," and that the "two month interval between the robbery and the search of [the defendant's] apartment did not dispel the probability that the currency, or some of it, remained in [the defendant's] apartment." *Id.* at 705 (citations omitted). The Ninth Circuit also noted that it had previously upheld "residential search warrants seeking evidence of crimes committed three and one half months earlier." *Id.* (citing *Jacobs*, 715 F.2d at 1346 (information supporting a search warrant for articles of clothing worn by bank robbers was not stale despite the passage of "three and a half months [] between the earliest prior bank robbery in which the clothing sought had been worn by the robbers"); *United States v. Collins*, 559 F.2d 561 (9th Cir. 1977) (information in support of a search warrant for articles of clothing was not stale where the warrant was issued six weeks after a bank robbery)).

In the instant case, Defendant was on house arrest with electronic monitoring at the time the September 2, 2014 bank robbery was committed. The information in the affidavit of probable cause suggesting Defendant's involvement in the September 2 bank robbery included Detective President's affirmation that he had received geographic mapping from the Office of the Superior Court Marshal ("Superior Court Marshal") indicating that Defendant was in the Bank of St. Croix at the time of the robbery and in the area where a vehicle used in the robbery was abandoned shortly thereafter. (Dkt. No. 130-2 at 6); *see Jones*, 994 F.2d at 1055-56 ("If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases."). In the Court's view, the fact that Defendant was on house arrest with electronic monitoring at the time of the robbery increases the likelihood that he would store any cash, clothing, and firearms used in the robbery at his place of residence, as he was required to be present at his residence most hours of the day and therefore would have fewer opportunities to store these items in some other secure area. *See id.* at 1056 (recognizing that "cash

is the type of loot that criminals seek to hide in secure places like their homes"). This fact also decreases the likelihood that Defendant would have moved these items to some other location during the 51 days that passed between the robbery and the issuance of the search warrant.

Accordingly, the Court finds that the information in the application for a search warrant was sufficient to establish a fair probability that evidence related to Defendant's alleged participation in the September 2, 2014 bank robbery would be found in his residence *even if* the information related to Defendant's alleged participation in the October 21, 2014 robbery were not considered. Defendant's argument to the contrary is rejected and his Motion to Suppress on that ground will be denied.

### C. *Franks* Challenge

Defendant asserts three bases for his claim that Detective President's affidavit of probable cause contained false statements or omissions made intentionally or with reckless disregard for the truth that were material to the Magistrate Judge's finding of probable cause.[6] First, Defendant alleges that Detective President made a knowingly false representation by asserting that he obtained global positioning system ("GPS") mapping from the Superior Court Marshal which revealed that Defendant was present inside the Bank of St. Croix at the time of the robbery on September 2, 2014. (Dkt. No. 214 at 17). Pointing to testimony from his trial on the bank robbery charges, Defendant contends that the GPS maps to which Detective President refers in his affidavit were *not* produced by the Superior Court Marshal—a fact of which Detective President was aware.

---

[6] During the suppression hearing on February 12, 2019, Defendant initially argued that Detective President knowingly or recklessly omitted material information from his affidavit by failing to indicate that Defendant did not reside alone, but instead shared his residence with other individuals. Defendant later acknowledged that this issue is not relevant to the *Franks* analysis, but is instead pertinent to his argument that the Government's evidence is insufficient to establish Defendant's constructive possession of the ammunition discovered in his residence, which the Court addressed earlier.

*Id.* Defendant also points to trial testimony to establish that the dates on the GPS maps allegedly indicating Defendant's movements on September 2, 2014 were input separately by someone other than Jeffrey Keith—a representative of the company that provides GPS tracking services to the Superior Court Marshal. *Id.* at 17.

Second, Defendant contends that Detective President omitted material information by failing to indicate in the affidavit that he had borrowed a GPS ankle tracker from the Superior Court Marshal prior to receiving the maps he used to support his request for a search warrant for Defendant's residence. *Id.* at 18. Defendant argues that this omission was material based on his claim that Detective President traveled with the borrowed GPS ankle tracker on the same route the Government alleges Defendant took on September 2, 2014, and later printed out a map of his own trip and falsified the date on the map to make it appear that the map reflected Defendant's movements on September 2, 2014 (as opposed to Detective President's movements on the date he borrowed the GPS ankle tracker). *Id.* at 18-19.

Third, Defendant asserts that Detective President omitted information regarding VIPD's concurrent investigation into another suspect—Troy Nisbett—as the perpetrator of the September 2, 2014 bank robbery. *Id.* at 19-20.

In sum, Defendant argues that witness testimony at Defendant's bank robbery trial provides evidence contradicting the information in Detective President's affidavit that is sufficient to satisfy his burden of making a substantial preliminary showing that Detective President knowingly or recklessly made false statements and omissions in his affidavit. Defendant maintains that the individual and cumulative effects of the false statements and omissions are material with respect to the Magistrate Judge's finding of probable cause for the search of Defendant's residence. *Id.*

The Government argues that Defendant is not entitled to a *Franks* hearing because he has failed to make the required substantial preliminary showing.[7] The Government challenges the conclusions Defendant draws from the trial testimony regarding the creation of the GPS maps allegedly reflecting Defendant's movements on September 2, 2014, and contends that Defendant has put forward no evidence to support his contention that Detective President fabricated the maps. (Dkt. No. 222 at 7-14).

### 1. Evidence Adduced at the Bank Robbery Trial

Defendant relies on the testimony of three witnesses at his bank robbery trial in his attempt to establish that Detective President knowingly, or with reckless disregard for the truth, made false statements or omissions in his affidavit in support of probable cause: (1) Jeffrey Keith ("Keith), a representative of B.I. Incorporated ("B.I."); (2) Superior Court Deputy Marshal Chris Richardson ("Deputy Marshal Richardson"); and (3) Detective President himself.

At Defendant's trial, Keith testified that his company, B.I., provides the Superior Court Marshal with ankle bracelets equipped with a GPS tracking device for use in the monitoring of individuals on house arrest. (CRIM. ACTION NO. 2015-0018, Dkt. No. 171 at 24:1-33:7). The GPS ankle bracelets collect and report GPS data in the form of latitude and longitude coordinates indicating the location of a given ankle bracelet. This information is stored on B.I.'s system, which can be accessed online. *Id.* at 27:19-28:7. Employees of the Superior Court Marshal are assigned a username and password to log on to the B.I. website, where they are able to review information

---

[7] The Government contends that Defendant has failed to provide the requisite affidavits or sworn or otherwise reliable statements of witnesses in support of his request. (Dkt. No. 222 at 15). However, the testimony of witnesses at trial are sworn statements of those witnesses. To the extent that testimony supports Defendant's contentions, the Court is aware of no authority—and the Government has cited none—that would prohibit Defendant from relying on trial testimony in support of his request for a *Franks* hearing.

about the location of individuals under the Superior Court Marshal's purview who are fitted with a GPS ankle bracelet. *Id.* at 32:17-33:7.

The B.I. program utilized by the Superior Court Marshal allows its users to superimpose the coordinates provided by the GPS tracking devices on top of generic Microsoft Bing maps. The street addresses on the generic maps are not provided by B.I., although the icons representing the location of a GPS ankle bracelet (based on latitude and longitude coordinates reported by the ankle bracelet) are B.I.-generated. *Id.* at 27:19-29:3. To create such a map, a B.I. program user would log into the B.I. system online and select a timeframe for a particular GPS ankle bracelet assigned to an individual on electronic monitoring. The program would then superimpose the location coordinates recorded by the GPS ankle bracelet for that particular timeframe on top of the generic map to generate what Keith referred to as a "mapping report." *Id.* at 27:19-28:7, 53:3-55:5. In this sense then, the generic maps themselves over which location coordinates are superimposed are not produced by the B.I. system. What the B.I. system allows a user to do is to create a mapping report that demonstrates location coordinates reported by a GPS ankle bracelet superimposed onto the generic map. *Id.* at 103:19-104:1.

At the trial, Keith testified that he entered the B.I. system and created a series of mapping reports introduced by the Government as Exhibit Group 6. *Id.* at 52:23-53:11. Keith testified that these mapping reports showed the location coordinates recorded by the GPS ankle bracelet worn by Defendant on various dates between August 20, 2014 and September 2, 2014, and on October 21, 2014. *Id.* at 52:23-63:23. The timeframes that the individual mapping reports cover are recorded directly on the mapping reports. *Id.* at 58:11-14. The mapping reports included in Government Exhibit Group 6 revealed, *inter alia*, the location coordinates recorded by the GPS ankle bracelet worn by Defendant from 6:00 p.m. on September 1, 2014 to 6:00 a.m. on September

2, 2014, and from 6:00 p.m. on September 2, 2014 to 6:00 a.m. on September 3, 2014. *Id.* at 61:25-63:9. The mapping reports in Government Exhibit Group 6 did *not*, however, reveal the location coordinates recorded by the GPS ankle bracelet worn by Defendant during the hours on September 2, 2014 that the robbery of the Bank of St. Croix occurred.

The Government also introduced a series of mapping reports labeled as Government Exhibit Group 5. Keith testified that the mapping reports were generated by the B.I. system. *Id.* at 67:23-68:1. He further testified that the mapping report in Government Exhibit 5-A2 depicts the location coordinates generated by the GPS ankle bracelet worn by Defendant on September 2, 2014 from 6:00 a.m. to 6:00 p.m. *Id.* at 72:8-12. Keith stated that Government Exhibits 5B through 5K were similar mapping reports or were "snapshots" of the mapping reports printed from a print-preview screen on the B.I. system that show minute-by-minute timestamps of the location coordinates reported by the GPS ankle bracelet worn by Defendant. *Id.* at 72:13-79:22.[8]

On cross-examination, Keith testified that he was not responsible for generating the mapping reports in Government Exhibits 5B, 5C, and 5D.[9] He also stated that he had later gone back and verified that the maps in those exhibits reflected "the correct person, the correct locations." *Id.* at 135:20-136:13.[10] Keith acknowledged that the exhibits did not contain a heading

---

[8] Keith also testified that he created an animated version of the mapping reports introduced as Government Exhibit 5Z. *Id.* at 80. Keith generated the animated map—which reflected the location coordinates on the GPS ankle bracelet worn by Defendant—by using the B.I. system. *Id.* at 160:8-161:7.

[9] Keith was not questioned on cross-examination about Government Exhibits 5E and 5F. He testified that Government Exhibit 5G showed points where a user had zoomed in to highlight location coordinates. *Id.* at 142:8-18.

[10] Keith testified that he believed the exhibits were generated by a "previous person" at B.I. named "Jason," although he could not be sure. *Id.* at 136:7-13, 191:6-10. He also testified that an employee of the Superior Court Marshal with access to the B.I. system would be able to generate

at the top of the page, similar to that contained on the exhibits in Government Exhibit Group 6, indicating that the report was created by the B.I. program. He also acknowledged that the dates and timeframes printed at the top of the mapping reports in Government Exhibit Group 5 were not generated by the B.I. program, but appeared to be typed onto the documents. *Id.* at 136:14-137:10. Keith testified that, for this reason, he went back to verify that the mapping reports were accurate. *Id.* Keith also testified that the absence of the B.I. heading and the date and timeframe information might be due to the fact that the exhibits reflected a printout of a print preview screen on the B.I. program, where that information is not contained. *Id.* at 137:20-138:14.

On redirect examination, Keith again stated that he could confirm that the information in Government Exhibits 5B, 5C, and 5D came from the B.I. system because the headings at the top of the mapping reports themselves—with the exception of the separate heading containing dates and times—were consistent with the headings produced by the B.I. system. *Id.* at 176:3-177:12. He also confirmed that he went back and verified that the information in the exhibits accurately reflected the information recorded in the B.I. system. *Id.*[11] The Government also introduced

---

mapping reports identical to the reports admitted as Government Exhibits 5B, 5C, and 5D. *Id.* at 190:22-191:24.

[11] Specifically, Keith testified as follows:

> Q: Now, any of these reports, 5B, C, D, did you do anything other than just looking at it to verify that they were in your system?
> A: I was shown the reports, and I pulled them up in our system to verify they were the same client, the same date ranges, so I did verify that they were accurate.
> Q: Did you verify the time?
> A: Yes.
> Q: So you were asked on cross-exam whether or not the jury would have any way of knowing whether this time is accurate. Do you remember that?
> A: Yes.
> Q: And that all they have is the fact that it's typed here on this map, do you recall that?
> A: Yes.
> Q: But you're saying that you verified it?

Government Exhibit 7C on redirect examination, which Keith testified was a B.I. report that listed the location coordinates recorded by the GPS ankle bracelet assigned to Defendant on September 2, 2014. *Id.* at 180:25-186-20. In other words, this exhibit reflected the location coordinates standing alone, without superimposing those coordinates over a generic map.

At Defendant's trial, Deputy Marshal Richardson testified that he was responsible for placing an ankle bracelet on Defendant when Defendant was placed on house arrest in April 2013. (CRIM. ACTION NO. 2015-0018, Dkt. No. 172 at 45:12-20).[12] Deputy Marshal Richardson further testified that there was a time in 2014 when he received a phone call from VIPD detectives requesting GPS tracking information on Defendant.[13] After receiving authorization from his superior, Deputy Marshal Richardson traveled to the VIPD station in Rainbow where he met with Detective President. Deputy Marshal Richardson accessed the B.I. system from a computer there. *Id.* at 119:7-15. He testified that he was asked for information regarding Defendant's location on

---

A: I did verify that in the system.

*Id.* at 176:18-177:11.

[12] When Deputy Marshal Richardson first installed the ankle bracelet, the bracelet used radio frequency signals—rather than GPS coordinates—to monitor movements. The technology employed by the ankle bracelet was updated to report GPS coordinates later that same year. *Id.* at 52:19-25.

Defendant resided at 319 Grove Place when he was fitted with the ankle bracelet. *Id.* at 46. Defendant's change of residence to Concordia Manor III, Apartment 62 was registered on an amended pretrial release order dated August 26, 2014. *Id.* at 60:22-61:32. Deputy Marshal Richardson updated the information in the B.I. system reflecting Defendant's residence around the time that Defendant's residence changed. *Id.* at 114:19-115:4.

[13] Deputy Marshal Richardson believed that the request came through either Detective President or Lieutenant Matthews. *Id.* at 118:4-7.

a "specific time and dates," and that he provided a map printout with that information.[14] Deputy

Marshal Richardson did not recall the date for which the information was requested. *Id.* at 119:5-

120:3. Deputy Marshal Richardson further testified that a map he printed from the B.I. system

would normally be identifiable because "B.I." would appear in the header, but that it "depended

on the print" because sometimes the "printer may cut it off[.]" *Id.* at 121:4-9. When questioned

specifically with regard to Government Exhibit 5B, Deputy Marshal Richardson testified that he

---

[14] At different times during his testimony, Deputy Marshal Richardson referred to the documents
that he provided to VIPD as "maps" and "coordinates," without clarifying this distinction. For
example, on cross-examination, Deputy Marshal Richardson testified as follows:

> Q: And you said you brought up the coordinates at VIPD?
> A: Yeah.
> Q: And what did you do with the information you brought up on the screen?
> A: All I did was they asked me for specific time and dates, and I just brought it up
> and I printed it out and that was it.
> Q: And what did you do with the printout?
> A: I provided them with the information that they asked.
> Q: And did you keep a copy for yourself?
> A: No.
> Q: And the information that they asked was what? Was it a report, was it a map,
> what was it that you gave to VIPD?
> A: Just a map. They wanted specifics, it was a map. They wanted to know where
> he was, and the time of a specific time, and a specific date.

*Id.* at 120:5-23. On redirect examination, Deputy Marshal Richardson stated that he was able to
find maps for Defendant as requested by VIPD. *Id.* at 132:19-133:6. Deputy Marshal Richardson
then stated, without prompting, that he found "[c]oordinates, not maps." *Id.* AUSA Andrews and
Deputy Marshal Richardson then engaged in the following colloquy:

> Q: You found coordinates. So whatever dates they asked, you were able to provide
> them maps?
> A: With his movements.
> Q: With his movements on that date in question?
> A: Yes.

*Id.* at 132:25-133:6.

could not be sure that the exhibit reflected one of the maps he printed and provided to the VIPD because it had "been a long time." *Id.* at 123:5-11.

During Defendant's trial, Detective President testified that as part of his investigation into the bank robbery, he visited the Superior Court on October 22, 2014 and met with Deputy Marshal Richardson to request GPS tracking information on Defendant's movements on September 2, 2014. (CRIM. ACTION NO. 2015-0018, Dkt. No. 173 at 62:15-63:14, 75:25-76:6).[15] Detective President initially testified that Deputy Marshal Richardson printed out several maps at the Superior Court. He later clarified that Deputy Marshal Richardson informed him while at the Superior Court that he (Deputy Marshal Richardson) would need authorization from his superiors before providing the GPS tracking information. Deputy Marshal Richardson traveled to the VIPD Frederiksted office "maybe a day later" to provide copies of the GPS tracking maps. *Id.* at 77:5-78:20, 84:11-85:3.

Detective President testified on cross-examination that, while at the Superior Court, he borrowed a GPS ankle bracelet from Deputy Marshal Richardson. With respect to this issue, Detective President testified as follows:

> Q: And what did you do with the bracelet?
> A: The one that we borrowed from Richardson?
> Q: Yes.
> A: We ran a test to see, test the accuracy of the bracelet.
> Q: So you drove up and down the island and you retraced what you thought was the path to the Bank of St. Croix and back; is that correct?
> A: I don't recall exactly where we went, but I remember we drove around to go back later and see if the area that was tracked on the GPS was, in fact, the area that we went to.
> Q: And how long did you have this bracelet?
> A: I don't recall. Could have been a day or two. I don't recall exactly.
> Q: To whom did you return it?

---

[15] Detective President also testified that, while at the Superior Court, he visited the cashier's office and checked the serial numbers of the bills in the cashier's possession, but did not find any connection between payments made by Defendant and the bank robbery. *Id.* at 76:4-18.

A: Marshal Richardson.

*Id.* at 78:24-79:25.

## 2.    Analysis

Based on the above trial testimony, the Court finds that Defendant has failed to make the required substantial preliminary showing that Detective President knowingly or recklessly made false statements or omissions in his affidavit of probable cause that were material to the Magistrate Judge's probable cause finding when he: (1) stated in his affidavit that he received the "geographic mapping of the Superior Court Marshal[] Service," and (2) did not disclose in his affidavit that he had borrowed a GPS ankle bracelet from Deputy Marshal Richardson or that Troy Nisbett was also being investigated as a suspect in the September 2014 bank robbery.

### a.  Alleged False Statement

Defendant's claim that Detective President presented false information in his affidavit by asserting that he received the "geographic mapping of the Superior Court Marshal[] Service" rests on two main contentions.

Defendant's first contention is that Deputy Marshal Richardson testified that he never provided maps to Detective President, but instead provided him with "coordinates." As noted above, however, Deputy Marshal Richardson used both the term "maps" and the term "coordinates" in describing the information he provided to Detective President. When asked on cross-examination what he had provided to VIPD, Deputy Marshal Richardson responded: "Just a map. They wanted specifics, it was a map." (CRIM. ACTION NO. 2015-0018, Dkt. No. 172 at 120:18-23). Then, in response to a question on redirect examination as to whether he found maps for Defendant at VIPD's request, Deputy Marshal Richardson stated: "Yes. Coordinates, not maps." AUSA Andrews asked: "You found coordinates. So whatever dates they asked, you were

able to provide them maps?" Deputy Marshal Richardson responded: "With his movements." AUSA Andrews asked: "With his movements on that date in question?" Deputy Marshal Richardson responded: "Yes." *Id.* at 132:19-133:6.

It is unclear from Deputy Marshal Richardson's testimony what distinction he is drawing between maps and coordinates. The Government argued during the suppression hearing that Deputy Marshal Richardson used the term "coordinates" to describe the information that he pulled up in the B.I. system, and the term "maps" to describe the printed documents he provided to Detective President. This explanation would be consistent with Keith's testimony describing how the B.I. program functions. Keith testified that the B.I. program stores latitude and longitude coordinates reported by GPS ankle bracelets, and then allows a user to retrieve those coordinates from the B.I. system and superimpose them over a generic Microsoft Bing map. Thus, Deputy Marshal Richardson would have had the ability to access information on the B.I. system in the form of GPS coordinates indicating the location of Defendant's ankle bracelet at specified dates and times, and would also have had the ability to print out a display of those coordinates superimposed over a map.

While the Court does not find that Deputy Marshal Richardson's testimony was sufficiently clear with respect to his usage of the terms "coordinates" and "maps" to definitively adopt the Government's explanation of his statements, the Court rejects Defendant's assertion that Deputy Marshal Richardson's testimony should be understood as an unequivocal statement that he provided Detective President with coordinates, and not maps. While recognizing that there was some ambiguity in his testimony, Deputy Marshal Richardson explicitly stated that he provided VIPD with a map on cross-examination. Although he later testified on redirect examination that he found "coordinates, not maps," he also stated in response to a follow-up question that he was

able to provide maps with Defendant's movements on the date in question. Defendant's reliance on Deputy Marshal Richardson's testimony does not, therefore, suffice to establish a substantial preliminary showing that Detective President's statement in his affidavit that he received maps from the Superior Court Marshal was false.

In order to make a substantial preliminary showing that Detective President knowingly or recklessly made a false statement in his affidavit of probable cause, Defendant must put forth an offer of proof that such a false statement was made, or demonstrate a satisfactory explanation for the absence of such proof. *Heilman*, 377 F. App'x at 177 (citing *Franks*, 438 U.S. at 171). Defendant's identification of an ambiguity in Deputy Marshal Richardson's trial testimony does not satisfy this burden—particularly where there is a potentially reasonable explanation for that ambiguity which is supported by trial testimony from Keith. Given the ambiguity, Defendant's cause is further undermined by his failure to present an affidavit from Deputy Marshal Richardson affirming that he did not provide maps to Detective President. If, as Defendant claims, Deputy Marshal Richardson had unequivocally testified to this fact at trial, the Court would expect Defendant to come forth with an affidavit from Deputy Marshal Richardson to this effect. The law is clear that Defendant is not entitled to a *Franks* hearing based on a mere desire to cross-examine Deputy Marshal Richardson on this issue. *See Yusuf*, 461 F.3d at 383 n.10 (quoting *Franks*, 438 U.S. at 171).[16]

Defendant's second contention is that the maps to which Detective President referred in his affidavit could not have been generated by the B.I. program because the origin of the date and

---

[16] Similarly, the Court finds that Deputy Marshal Richardson's inability to recall at Defendant's trial whether Government Exhibit 5B was one of the maps he provided to VIPD is insufficient to establish a substantial preliminary showing that Detective President's assertion that he received the maps from the Superior Court Marshal was false.

time stamps contained in those maps is unaccounted for. It is true that the origin of the headings containing date and time stamps in Government Exhibits 5B, 5C, and 5D was not identified at Defendant's trial. Keith testified that those headings were not produced by the B.I. program, and appeared to be typed into the documents. However, contrary to Defendant's assertion, Keith confirmed at trial that Government Exhibits 5B, 5C, and 5D were indeed mapping reports generated by the B.I. program—albeit with the headings containing date and time stamps added. Keith also testified that it was because of these headings that he personally verified in the B.I. system that the information contained in the exhibits was accurate. Keith stated that he verified that the exhibits correctly reflected Defendant's location on the date and times indicated by the headings.

Keith's trial testimony therefore controverts Defendant's contention that the maps that Detective President referred to in his affidavit could not have been generated by the B.I. program. Absent a showing that the maps were not produced by the B.I. program used by the Superior Court Marshal, Defendant fails to make a substantial preliminary showing that Detective President's representation that he received the maps from the Superior Court Marshal was false. That the origin of the headings containing date and time stamps on the maps was not identified at trial does not constitute proof that the maps themselves (with the exception of the headings) were not generated by the B.I. program—particularly where Keith testified that he verified the accuracy of the information contained in the maps against the information in the B.I. system. Accordingly, the Court finds that Defendant has failed to demonstrate his entitlement to a *Franks* hearing on this basis.[17]

---

[17] Two other contentions advanced by Defendant in support of his claim that Detective President's statement that he received the geographic mapping of the Superior Court Marshal was false are technical in nature and do not advance Defendant's cause. First, Defendant asserts that any

### b. Alleged Material Omissions

Having concluded that Defendant has failed to make a substantial preliminary showing that Detective President's assertion that he received maps from the Superior Court Marshal was false, the Court now turns to Defendant's claims that Detective President omitted material information from his affidavit by: (1) failing to indicate that he borrowed a GPS ankle bracelet from the Superior Court Marshal; and (2) failing to indicate that Troy Nisbett was also being investigated as a suspect in the September 2, 2014 bank robbery.

---

mapping reports Detective President received were not in fact generated by the Superior Court Marshal, but rather were generated by B.I. The Court acknowledges that a more precise description of the maps Detective President received from Deputy Marshal Richardson would be the "geographic mapping of B.I."—as opposed to the "geographic mapping of the Superior Court Marshal"—because it is the B.I. program that is used to generate the maps. However, B.I. provided the geographic mapping program for the Superior Court Marshal. Deputy Marshal Richardson had access to the B.I. program, and Keith testified that a B.I. program user from the Superior Court Marshal would have the ability to utilize the program's mapping functions. Both Detective President and Deputy Marshal Richardson testified that Deputy Marshal Richardson provided maps to Detective President following Detective President's request for GPS tracking information on Defendant. Under these circumstances, although Detective President's representation that he received the geographic mapping of the Superior Court Marshal may contain a technical inaccuracy, it is not false. The Court finds no support in the record for a conclusion that Detective President had reason to doubt the truth of this assertion given that he in fact received the maps from a Superior Court Deputy Marshal. *See Wilson,* 212 F.3d at 783 (explaining that "assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting").

Second, Defendant's claim that B.I. "has nothing to do with the creation of [] maps" (Dkt. No. 214 at 13)—and that Detective President could not therefore have received maps from the Superior Court Marshal—is equally unavailing for purposes of establishing the falsity of Detective President's statement. The Court acknowledges Keith's testimony that the B.I. program utilizes generic Microsoft Bing maps. Although it is true that B.I. is not responsible for the creation of Microsoft Bing maps, Keith's testimony clearly establishes that the B.I. program allows a user to create a mapping report that superimposes the GPS coordinates registered by an ankle bracelet over the generic Microsoft Bing map. Contrary to Defendant's claims, trial testimony established that Deputy Marshal Richardson—as a B.I. program user—would be able to generate mapping reports using the B.I. program.

In order to establish his entitlement to a *Franks* hearing, Defendant must make a substantial preliminary showing both that Detective President knowingly or recklessly omitted information from the affidavit, and that this information was material to a finding of probable cause. The Court finds that Defendant has failed to make a substantial showing that any of the information that Detective President did not include in the affidavit was material to the probable cause finding.

Defendant's claim of materiality with regard to Detective President's failure to indicate that he had borrowed a GPS ankle bracelet from the Superior Court Marshal is necessarily tied to Defendant's ability to demonstrate that the maps contained in Government Exhibits 5B, 5C, and 5D did *not* reflect location coordinates recorded by the GPS ankle bracelet worn by Defendant on September 2, 2014. Defendant's underlying theory is that Detective President borrowed the GPS ankle bracelet; traveled the path Defendant allegedly took on September 2, 2014 in order that the borrowed GPS ankle bracelet would record those location coordinates; printed maps of the route Detective President *himself* took with the borrowed GPS ankle bracelet; labeled the maps reflecting Detective President's movements with the date September 2, 2014; and presented the maps as evidence of Defendant's involvement in the bank robbery "knowing full well that [Detective] President himself created those tracking coordinates[.]" (Dkt. No. 214 at 18-19). As such, the fact that Detective President borrowed the GPS ankle bracelet from the Superior Court Marshal is only material to the probable cause finding if there is support in the record for Defendant's theory that Detective President fabricated the maps contained in Government Exhibits 5B, 5C, and 5D.

The Court does not find a sufficient factual basis in the record for Defendant's theory that Detective President fabricated the maps at issue to support a finding that Defendant has made a substantial preliminary showing that Detective President omitted material information from the affidavit of probable cause by failing to indicate that he had borrowed a GPS ankle bracelet from

the Superior Court Marshal. Defendant's theory is largely the product of speculation built on the absence of an explanation at Defendant's bank robbery trial for the origin of the headings containing date and time stamps in the maps. In other words, Defendant has identified a gap in the evidence presented by the Government at his bank robbery trial, and has developed a narrative to explain that gap. While potentially a means of casting doubt on the Government's evidence in the trial context, Defendant's narrative—absent sufficient supporting facts in the existing record—is inadequate to establish his entitlement to a *Franks* hearing. This is particularly so where other record evidence—including Keith's testimony that he personally verified that the information contained in the maps was accurate—contradicts Defendant's theory.

Because the record lacks sufficient support for Defendant's theory that Detective President fabricated the maps that he relied on to secure the search warrant for Defendant's residence, Defendant cannot show that Detective President's failure to indicate in his affidavit that he had borrowed a GPS ankle bracelet from the Superior Court Marshal was material to the Magistrate Judge's probable cause determination. In fact, assuming Detective President *had* represented that he borrowed a GPS ankle bracelet from the Superior Court Marshal to test its accuracy—as he testified at trial—the addition of this information to the affidavit would likely have *strengthened* the basis for a finding of probable cause by the Magistrate Judge, because Detective President would have effectively been vouching for the accuracy of the GPS tracking information presented in support of his request for the search warrant.

The Court similarly finds that Defendant has failed to make a substantial preliminary showing that Detective President's failure to include in his affidavit that Troy Nisbett was also being investigated as a suspect in the bank robbery was material to the Magistrate Judge's finding of probable cause.

"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Schneyder v. Smith*, 653 F.3d 313, 323 (3d Cir. 2011) (internal alterations omitted) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Given that the GPS tracking information referenced in Detective President's affidavit allegedly indicated that Defendant was in the Bank of St. Croix at the time of the robbery and in the location where the vehicle used in the robbery was discovered shortly thereafter, the Court does not find that Detective President's failure to attest that VIPD was also investigating leads into another suspect's potential involvement in the robbery would have impacted the Magistrate Judge's finding that there was a reasonable ground to believe that Defendant committed the bank robbery. Thus, this omission was not material to a finding of probable cause.

### c. *Franks* Challenge Summary

In sum, with respect to each of the false representations and omissions alleged by Defendant—both individually and in combination—the Court finds that Defendant has failed to make the required substantial preliminary showing that Detective President made false representations and omissions in his affidavit in support of the search warrant that were material to the Magistrate Judge's finding of probable cause. To be sure, Defendant has identified certain gaps in the evidence presented by the Government at Defendant's bank robbery trial—most obviously, the lack of an explanation as to the origin of the headings containing date and time stamps in Government Exhibits 5B, 5C, 5D. However, Defendant has not made a substantial preliminary showing in support of his claim that Detective President presented false information or omitted material information from his affidavit of probable cause. Accordingly, the Court will deny Defendant's request for a *Franks* hearing and will deny the portion of his Motion to Suppress

grounded in the argument that the search warrant for his residence was not supported by probable cause.

## IV.    CONCLUSION

For the reasons discussed above, the Court will deny Defendant's Motion to Suppress. Specifically, the Court will: (1) deny without prejudice—as premature—the portion of Defendant's Motion to Suppress grounded in the argument that the Government's evidence is insufficient to establish Defendant's constructive possession of the ammunition discovered in his residence; (2) deny the portion of Defendant's Motion to Suppress grounded in the argument that information in the affidavit in support of probable cause was stale; (3) deny the portion of Defendant's Motion to Suppress grounded in the argument that the search warrant for his residence was not supported by probable cause; and (4) deny Defendant's request for a *Franks* hearing.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 15, 2019

                                    _____/s/_____
                                      WILMA A. LEWIS
                                      Chief Judge